Sheehan & Associates, P.C.
Spencer Sheehan
505 Northern Blvd Ste 311
Great Neck NY 11021-5101
Telephone: (516) 303-0552
Fax: (516) 234-7800
*spencer@spencersheehan.com*

Reese LLP
Michael R. Reese
100 W 93rd St Fl 16
New York NY 10025-7524
Telephone: (212) 643-0500
Fax: (212) 253-4272
*mreese@reesellp.com*

United States District Court
Southern District of New York                          1:19-cv-09677-PKC

Natasha Barreto, individually and on behalf
of all others similarly situated,

                                    Plaintiff,

                    - against -                        First Amended Class Action
                                                       Complaint

Westbrae Natural, Inc.,

                                    Defendant

Plaintiff by attorneys alleges upon information and belief, except for allegations pertaining to plaintiff, which are based on personal knowledge:

1.      Westbrae Natural, Inc. ("defendant") manufactures, distributes, markets, labels and sells unsweetened soymilk beverages purporting to be flavored only by vanilla under their Westsoy brand ("Products").

2.      The Products are available to consumers from retail and online stores of third-parties and are sold in sizes including cartons of 32 OZ and 64 OZ.

3.      The relevant front label representations include the brand, "Organic,"

"Unsweetened," "Soymilk," "Vanilla," "American Heart Association Certified" and "9g Protein."



4.      The Product's information panel contains the Nutrition Facts and ingredient list.



5.      The unqualified, prominent and conspicuous representation as "Vanilla" is false, deceptive and misleading because the Product contains non-vanilla flavors which imitate and

extend vanilla but are not derived from the vanilla bean, yet these flavors are not disclosed to consumers as required and expected.

I.   Increase in Consumption of Non-Dairy, Plant-Based Milk Alternatives

6.    Over the past ten years, the number of dairy milk substitutes has proliferated to include "milks" (milk-like beverages) made from various agricultural commodities.

7.    Some of the most popular milk alternatives are made from soybeans, rice and almonds.

8.    Reasons for consuming non-dairy milks include avoidance of animal products due to health, environmental or ethical reasons, dietary goals or food allergies.[1]

9.    Studies indicate that of the 7.2 million U.S. adults with food allergies, 3 million are allergic to tree nuts, 1.5 million are allergic to soy and a very small number are allergic to rice.[2]

10.   Whether due to few people being allergic to soy and tree nuts (almonds) or the different qualities of each product type, consumers seldom substitute between these products.

11.   They are typically sold in sweetened and unsweetened varieties with added characterizing flavors.

12.   The amount and type of flavoring used in rice, almond and soy milks vary based upon the texture and taste of the product type.

II.    Vanilla is Constantly Subject to Efforts at Imitation Due to High Demand

13.   The tropical orchid of the genus Vanilla (*V. planifolia*) is the source of the prized flavor commonly known as vanilla, defined by law as "the total sapid and odorous principles

---

[1] Margaret J. Schuster, et al. "Comparison of the Nutrient Content of Cow's Milk and Nondairy Milk Alternatives: What's the Difference?," *Nutrition Today* 53.4 (2018): 153-159.
[2] Ruchi Gupta et al., "Prevalence and severity of food allergies among US adults," JAMA network open 2, no. 1 (2019): e185630-e185630.

extractable from one-unit weight of vanilla beans."[3]

14.    Vanilla's "desirable flavor attributes…make it one of the most common ingredients used in the global marketplace, whether as a primary flavor, as a component of another flavor, or for its desirable aroma qualities."[4]

15.    Though the Pure Food and Drugs Act of 1906 ("Pure Food Act") was enacted to "protect consumer health and prevent commercial fraud," this was but one episode in the perpetual struggle against those who have sought profit through sale of imitation and lower quality commodities, dressed up as the genuine articles.[5]

16.    It was evident that protecting consumers from fraudulent vanilla would be challenging, as E. M. Chace, Assistant Chief of the Foods Division of the U.S. Department of Agriculture's Bureau of Chemistry, noted "There is at least three times as much vanilla consumed [in the United States] as all other flavors together."[6]

17.    This demand could not be met by natural sources of vanilla, leading manufacturers to devise clever, deceptive and dangerous methods to imitate vanilla's flavor and appearance.

18.    Today, headlines tell a story of a resurgent global threat of "food fraud" – from olive oil made from cottonseeds to the horsemeat scandal in the European Union.[7]

19.    Though "food fraud" has no agreed-upon definition, its typologies encompass an

---

[3] 21 C.F.R. §169.3(c).

[4] Daphna Havkin-Frenkel, F.C. Bellanger, Eds., Handbook of Vanilla Science and Technology, Wiley, 2018.

[5] Berenstein, 412; some of the earliest recorded examples of food fraud include unscrupulous Roman merchants who sweetened wine with lead.

[6] E. M. Chace, "The Manufacture of Flavoring Extracts," Yearbook of the United States Department of Agriculture 1908 (Washington, DC: Government Printing Office, 1909) pp.333–42, 333 quoted in Nadia Berenstein, "Making a global sensation: Vanilla flavor, synthetic chemistry, and the meanings of purity," History of Science 54.4 (2016): 399-424 at 399.

[7] Jenny Eagle, 'Today's complex, fragmented, global food supply chains have led to an increase in food fraud', FoodNavigator.com, Feb. 20, 2019; M. Dourado et al., Do we really know what's in our plate?. Annals of Medicine, 51(sup1), 179-179 (May 2019); Aline Wisniewski et al., "How to tackle food fraud in official food control authorities in Germany." Journal of Consumer Protection and Food Safety: 1-10. June 11, 2019.

ever-expanding, often overlapping range of techniques with one common goal: giving consumers

less than what they bargained for.

   A.   Food Fraud as Applied to Vanilla

   20.   Vanilla is considered a "high-risk [for food fraud] product because of the multiple

market impact factors such as natural disasters in the source regions, unstable production, wide

variability of quality and value of vanilla flavorings," second only to saffron in price.[8]

   21.   The efforts at imitating vanilla offers a lens to the types of food fraud regularly

employed across the spectrum of valuable commodities in today's interconnected world.[9]

| Type of Food Fraud | Application to Vanilla |
|---|---|
| ➢ Addition of markers specifically tested for instead of natural component of vanilla beans | • Manipulation of the carbon isotope ratios to produce synthetic vanillin with similar carbon isotope composition to natural vanilla |
| | • Ground vanilla beans and/or seeds to provide visual appeal as "specks" so consumer thinks the product contains real vanilla beans, when the ground beans have been exhausted of flavor |
| ➢ Appearance of *more* and/or higher quality of the valued ingredient | • Caramel to darken the color of an imitation vanilla so it more closely resembles the hue of real vanilla[10] |
| | • Annatto and turmeric extracts in dairy products purporting to be flavored with vanilla, which causes the color to better resemble the hue of rich, yellow butter |

---

[8] Société Générale de Surveillance SA, ("SGS "), Authenticity Testing of Vanilla Flavors – Alignment Between Source Material, Claims and Regulation, May 2019.
[9] Kathleen Wybourn, DNV GL, Understanding Food Fraud and Mitigation Strategies, PowerPoint Presentation, Mar. 16, 2016.
[10] Renée Johnson, "Food fraud and economically motivated adulteration of food and food ingredients." Congressional Research Service R43358, January 10, 2014.

| | |
|---|---|
| ➤ Substitution and replacement of a high quality ingredient with alternate ingredient of lower quality | • Tonka beans, though similar in appearance to vanilla beans, are banned from entry to the United States due to fraudulent use<br>• Coumarin, a toxic phytochemical found in Tonka beans, added to imitation vanillas to increase vanilla flavor perception |
| ➤ Addition of less expensive substitute ingredient to mimic flavor of more valuable component | • Synthetically produced ethyl vanillin, from recycled paper, tree bark or coal tar, to imitate taste of real vanilla |
| ➤ Compounding, Diluting, Extending | • "to mix flavor materials together at a special ratio in which they [sic] compliment each other to give the desirable aroma and taste"[11]<br>• Combination with flavoring substances such as propenyl guaethol ("Vanitrope"), a "flavoring agent [, also] unconnected to vanilla beans or vanillin, but unmistakably producing the sensation of vanilla"[12]<br>• "Spiking" or "fortification" of vanilla through addition of natural and artificial flavors including vanillin, which simulates vanilla taste but obtained from tree bark |
| ➤ Addition of fillers to give the impression there is more of the product than there actually is | • Injection of vanilla beans with mercury, a poisonous substance, to raise the weight of vanilla beans, alleged in *International Flavors and Fragrances (IFF), Inc. v. Day Pitney LLP and Robert G. Rose,* 2005, Docket Number L-4486-09, Superior Court of New Jersey, Middlesex County |

---

[11] Chee-Teck Tan, "Physical Chemistry in Flavor Products Preparation: An Overview" in Flavor Technology, ACS Symposium Series, Vol. 610 1995. 1-17.
[12] Berenstein, 423.

- Subtle, yet deliberate misidentification and obfuscation of a product's components and qualities as they appear on the ingredient list
  - o "ground vanilla beans" gives impression it describes unexhausted vanilla beans when actually it is devoid of flavor and used for aesthetics
  - o "natural vanilla flavorings" – "-ing" as suffix referring to something *like* that which is described

➢ Ingredient List Deception[13]
  - o "Vanilla With Other Natural Flavors" – implying – wrongly – such a product has a sufficient amount of vanilla to characterize the food
  - o "Natural Flavors" – containing "natural vanillin" derived not from vanilla beans but from tree pulp. When paired with real vanilla, vanillin is required to be declared as an artificial flavor
  - o "Non-Characterizing" flavors which are not identical to vanilla, but that extend vanilla

22.    The "plasticity of legal reasoning" with respect to food fraud epitomize what H. Mansfield Robinson and Cecil H. Cribb noted in 1895 in the context of Victorian England:

> the most striking feature of the latter-day sophisticator of foods is his knowledge of the law and his skill in evading it. If a legal limit on strength or quality be fixed for any substance (as in the case of spirits), he carefully brings his goods right down to it, and perhaps just so little below that no magistrate would convict him.

*The law and chemistry of food and drugs.* London: F.J. Rebman at p. 320.[14]

B.    The Use of Vanillin to Simulate Vanilla

23.    The most persistent challenger to the authenticity of real vanilla has been synthetic

---

[13] Recent example of this would be "evaporated cane juice" as a more healthful sounding term to consumers to identify sugar.
[14] Cited in Sébastien Rioux, "Capitalist food production and the rise of legal adulteration: Regulating food standards in 19th-century Britain," Journal of Agrarian Change 19.1 (2019) at p. 65 (64-81).

versions of its main flavor component, vanillin.

24.    First synthesized from non-vanilla sources by German chemists in the mid-1800s, vanillin was the equivalent of steroids for vanilla flavor.

25.    According to Skip Rosskam, a professor of vanilla at Penn State University and former head of the David Michael flavor house in Philadelphia, "one ounce of vanillin is equal to a full gallon of single-fold vanilla extract."[15]

26.    Today, only 1-2% of vanillin in commercial use is vanillin obtained from the vanilla plant, which means that almost all vanillin has no connection to the vanilla bean.

27.    Nevertheless, disclosure of this powerful ingredient has always been required where a product purports to be flavored with vanilla. *See* Kansas State Board of Health, Bulletin, Vol. 7, 1911, p. 168 (cautioning consumers that flavor combinations such as "vanilla and vanillin…vanilla flavor compound," etc., are not "vanilla [extract] no matter what claims, explanations or formulas are given on the label.").

28.    Since vanilla is the only flavor with its own standard of identity, its labeling is controlled not by the general flavor regulations but by the standards for vanilla ingredients.

29.    This means that if a product is represented as being characterized by vanilla yet contains non-vanilla vanillin, the label and packaging must declare vanillin an artificial flavor. *See* Vanilla-vanillin extract at 21 C.F.R. § 169.180(b) ("The specified name of the food is 'Vanilla-vanillin extract _-fold' or '_-fold vanilla-vanillin extract', followed immediately by the statement 'contains vanillin, an artificial flavor (or flavoring)'."); *see also* 21 C.F.R. § 169.181(b), § 169.182(b) (Vanilla-vanillin flavoring and Vanilla-vanillin powder).

30.    This prevents consumers from being misled by products which may taste similar to

---

[15] Katy Severson, Imitation vs. Real Vanilla: Scientists Explain How Baking Affects Flavor, Huffington Post, May 21, 2019.

real vanilla and but for consumer protection requirements, would be sold at the price of real vanilla.

C. Production of "Natural Vanillins" Combined with "Natural Vanilla"

31.    The past ten years have seen many vanillins purporting to be a "natural flavor" – derived from a natural source material which undergoes a natural production process.

32.    However, "natural vanillin" is not a "natural vanilla flavor" because the raw material is not vanilla beans but ferulic acid and eugenol.

33.    Ferulic acid can be converted to vanillin through a natural fermentation process which is cost prohibitive for almost all applications.

34.    Vanillin from eugenol is easier to produce in a way claimed to be a "natural process."

35.    However, because this process occurs without transparency or verification in China, regulators and consumers are not told the production method is more properly described as that of an artificial flavor, involving a chain of chemical reactions.

III.    Flavor Industry's Efforts to Use Less Vanilla, Regardless of any Shortages

36.    The "flavor industry" refers to the largest "flavor houses" such as Symrise AG, Firmenich, Givaudan, International Flavors and Fragrances (including David Michael), Frutarom and Takasago International along with the largest food manufacturing companies such as Unilever.

37.    The recent global shortage of vanilla beans has provided the flavor industry another opportunity to "innovate[ing] natural vanilla solutions…to protect our existing customers."[16]

38.    Their "customers" do not include the impoverished vanilla farmers nor consumers, who are sold products labeled as "vanilla" for the same or higher prices than when those products contained *only* vanilla.

---

[16] Amanda Del Buouno, Ingredient Spotlight, Beverage Industry, Oct. 3, 2016.

39.    These efforts include (1) market disruption and manipulation and (2) the development of alternatives to vanilla which completely or partially replace vanilla.

A.    Flavor Industry's Attempt to Disrupt Supply of Vanilla to Create a "Permanent Shortage"

40.    The flavor industry has developed schemes such as the "Sustainable Vanilla Initiative" and "Rainforest Alliance Certified," to supposedly assure a significant supply of vanilla at stable, reasonable prices.

41.    Contrary to their intention, these programs make vanilla less "sustainable" by paying farmers to destroy their vanilla and harvest palm oil under the pretense of "crop diversification."

42.    There have also been allegations that these programs use child and/or slave labor.

43.    Other tactics alleged to be utilized by these companies include "phantom bidding," where saboteurs claim they will pay a higher price to small producers, only to leave the farmers in the lurch, forced to sell at bottom dollar to remaining bidders.[17]

44.    The reasons for these counterintuitive actions is because they benefit from high vanilla prices and the use of less real vanilla.

45.    When less vanilla is available, companies must purchase the higher margin, proprietary, "vanilla-like" flavorings made with advanced technology and synthetic biology.

B.    Use of Vanilla WONF Ingredients to Replace and Provide Less Vanilla

46.    Though flavor companies will not admit their desire to move off real vanilla, this conclusion is consistent with the comments of industry executives.

47.    According to Suzanne Johnson, vice president or research at a North Carolina laboratory, "Many companies are trying to switch to natural vanilla with other natural flavors

---

[17] Monte Reel, The Volatile Economics of Natural Vanilla in Madagascar, Bloomberg.com, Dec. 16, 2019.

[WONF] in order to keep a high-quality taste at a lower price," known as "Vanilla WONF."

48.    The head of "taste solutions" at Irish conglomerate Kerry urged flavor manufacturers to "[G]et creative" and "build a compounded vanilla flavor with other natural flavors."

49.    A compounded vanilla flavor "that matches the taste of pure vanilla natural extracts" can supposedly "provide the same vanilla taste expectation while requiring a smaller quantity of vanilla beans. The result is a greater consistency in pricing, availability and quality."[18]

50.    These compounded flavors exist in a "black box" with "as many as 100 or more flavor ingredients," including potentiators and enhancers, like maltol and piperonal, blended together to enhance the vanilla, allowing the use of less vanilla to achieve the intended taste.[19]

51.    The effort to replace vanilla with so-called Vanilla WONF started in the late 1960s, but the last 10 years have seen the proliferation of this ingredient.

C.  Decline of Industry Self-Governance

52.    That high level executives in the flavor industry are willing to boast of their stratagems to give consumers less vanilla for the same or greater price is not unexpected.

53.    The once powerful and respected trade group, The Flavor and Extract Manufacturers Association ("FEMA"), abandoned its "self-policing" of misleading vanilla labeling claims and disbanding its Vanilla Committee.

54.    FEMA previously opposed industry efforts to deceive consumers, but cast the public to the curb in pursuit of membership dues from its largest members, such as Unilever.

IV.    Front Label is Misleading Due to Not Disclosing Non-Vanilla Flavors That Affect the Amount of Vanilla Used and Enhance the Vanilla Taste

---

[18] Donna Berry, Understanding the limitations of natural flavors, BakingBusiness.com, Jan. 16, 2018.
[19] Hallagan and Drake, FEMA GRAS and U.S. Regulatory Authority: U.S. Flavor and Food Labeling Implications, Perfumer & Flavorist, Oct. 25, 2018; Charles Zapsalis et al., *Food chemistry and nutritional biochemistry*. Wiley, 1985, p. 611 (describing the flavor industry's goal to develop vanilla compound flavors "That *Seem*[s] to be Authentic or at Least Derived from a Natural Source") (emphasis added).

55.    The Product's designation of its characterizing flavor as "Vanilla" without any qualifying terms – flavored, with other natural flavors, artificially flavored – gives consumers the impression that its entire flavor (taste sensation and ingredient imparting same) is contributed by the characterizing food ingredient of vanilla beans. *See* 21 C.F.R. § 101.22(i)(1) (describing a food which contains no simulating artificial flavor and not subject to 21 C.F.R. § 101.22(i)(1)(i)-(iii)).

56.    Consumers have these expectations because regulations have long been in place to require companies to designate a product's characterizing flavor in a way which tells them accurate information to make an informed choice.

57.    For instance, a food labeled "strawberry shortcake," "vanilla soymilk" or "apple pie," will be expected to contain an amount of the characterizing ingredients – strawberries, vanilla or apples – to independently characterize the food. *See* 21 C.F.R. § 101.22(i)(1) ("If the food contains no artificial flavor which simulates, resembles or reinforces the characterizing flavor, the name of the food on the principal display panel or panels of the label shall be accompanied by the common or usual name of the characterizing flavor, e.g., "vanilla", in letters not less than one-half the height of the letters used in the name of the food, except that…").

58.    By not including any qualifying terms after "vanilla" such as "flavored" or "other natural flavors," consumers will expect the Product contains actual vanilla from the vanilla bean, that vanilla is the characterizing flavor, the amount of vanilla is sufficient to flavor the Product, no other flavors simulate, resemble, reinforce, enhance or extend the flavoring from vanilla.

59.    The Product's front label misleads consumers because even though it states "Vanilla," it does not disclose that it contains "Other Natural Flavors," as indicated on its ingredient list.

**INGREDIENTS:** ORGANIC SOYMILK (FILTERED WATER, WHOLE ORGANIC SOYBEANS), NATURAL VANILLA FLAVOR WITH OTHER NATURAL FLAVORS.

A.  Defendant's Front Label Misleads Consumers by Not Disclosing Non-Vanilla Flavors

60.  Federal regulations define "Other Natural Flavors" as flavors not from the product whose flavor is simulated:

> If the food contains both a characterizing flavor from the product whose flavor is simulated and other natural flavor which simulates, resembles or reinforces the characterizing flavor, the food shall be labeled in accordance with the introductory text and paragraph (i)(1)(i) of this section and the name of the food shall be immediately followed by the words "with other natural flavor" in letters not less than one-half the height of the letters used in the name of the characterizing flavor.

61.  The term "With Other Natural Flavors" following the name of the characterizing flavor of vanilla ("Natural Vanilla Flavor") on the ingredient list means these flavors (1) are not derived from vanilla and (2) "simulate[s], resemble[s] or reinforce[s] the characterizing flavor" of vanilla.  *See* 21 C.F.R. § 101.22(i)(1)(iii).

62.  Though defendant discloses the non-vanilla flavors on the ingredient list, it is also required to include them on the front label.

63.  If the amount of vanilla from vanilla beans is sufficient to independently characterize the Product, the front label could state "[Vanilla] With Other Natural Flavor." *See* 21 C.F.R. § 101.22(i)(1)(iii); *see also* 21 C.F.R. § 101.22(i)(1) ("introductory text" describing scenario where food contains "no artificial flavor which simulates, resembles or reinforces the characterizing flavor," and none of the sub-paragraphs of 21 C.F.R. § 101.22(i)(1) apply).

64.  If the amount of vanilla from vanilla beans is insufficient to independently

characterize the Product, the front label would state "[Vanilla] Flavored With Other Natural Flavor." *See* 21 C.F.R. § 101.22(i)(1)(iii) referring to "paragraph (i)(1)(i) of this section"; *see also* 21 C.F.R. § 101.22(i)(1)(i).

65.    Defendant's front label fails to choose either of these options which is misleading to consumers who expect the Product's flavor to come entirely from vanilla, since there are no qualifications on the front label.

B.    Even If the Front Label Indicated "With Other Natural Flavor," it Would be Misleading to Fail to Distinguish "Vanilla"

66.    If the front label merely stated "Vanilla Flavor With Other Natural Flavor," consumers would still be deceived because they are accustomed to the standardized vanilla ingredients – vanilla extract and vanilla flavoring.

67.    Because these ingredients "are expensive" and valued by consumers because of their quality, it misleading to not distinguish such flavor combinations from other similar products. Exhibit A, Letter from FDA to Ernie Molina, Warner-Jenkinson Company of California, January 17, 1980 ("the general principles of 21 CFR 102.5 should apply" when a product contains vanilla with other natural flavors so consumers are not misled as to the amount of vanilla).

68.    21 C.F.R. § 102.5(b) requires disclosure of the "percentage(s) of any characterizing ingredient(s) or component(s) [as part of the product name] when the proportion of such ingredient(s) or component(s) in the food has a material bearing on price or consumer acceptance or when the labeling or the appearance of the food may otherwise create an erroneous impression that such ingredient(s) or component(s) is present in an amount greater than is actually the case."

69.    If the "Natural Vanilla Flavor With Other Natural Flavors" consists of half vanilla and half non-vanilla natural flavors, the Product name should state "contains 50% vanilla extract and 50% non-vanilla flavors" or whatever the proportions are. Exhibit A; 21 C.F.R. § 102.5(b).

V.    Gas-Chromatography-Mass Spectrometry Analysis Reveals the Product Contains Little if any Real Vanilla yet High Levels of Non-Vanilla Vanillin

70.    One of the most valuable ways to detect food fraud is to break a food down into its component parts.

71.    Where a flavor is the target of food fraud, gas chromatography-mass spectrometry ("GC-MS") is "the analysis method of choice for smaller and volatile molecules such as benzenes, alcohols and aromatics" as it is able to "separate complex mixtures [, and] to quantify analytes."[20]

72.    Beginning with the gas chromatograph, the sample is vaporized (the gas phase) and separated into its components by a capillary column "packed with a stationary (solid) phase."

73.    The compounds are "propelled by an inert carrier gas such as argon, helium or nitrogen" where they  separate from each other and "elute from the column at different times, which is generally referred to as their retention times."

74.    After the components exit the GC column, "they are ionized by the mass spectrometer using electron or chemical ionization sources."

75.    Ionized molecules get accelerated through the mass analyzer, which is typically a quadrupole or ion trap.

76.    Then the "ions are separated based on their different mass-to-charge (m/z) ratios."

77.    The last steps "involve ion detection and analysis, with compound peaks appearing as a function of their m/z ratios, with peak heights "proportional to the quantity of the corresponding compound."

78.    A complex sample will generate "several different peaks, and the final readout will be a mass spectrum" which plots the elution time on the X-axis and the amount or intensity of the compounds on the Y-axis.

---

[20] ThermoFisher Scientific, Gas Chromatography Mass Spectrometry (GC/MS) Information.

79.    Computer databases of mass spectra are used, like a DNA database, to match the detected compounds based on their m/z ratio.[21]

80.    For a flavor like vanilla, GC-MS can detect the presence of the four vanilla marker compounds, which are present in consistent amounts:

| Compounds | Percent Present in Vanilla Beans |
|---|---|
| vanillin | 1.3-1.7 % |
| p-hydroxybenzaldehyde | 0.1% |
| vanillic acid | 0.05% |
| p-hydroxybenzoic acid | 0.03% |

81.    The Product was subjected to GC-MS analysis which generated the below chromatogram and peak assignment table.  Exhibit B, GC-MS Report, January 31, 2020, p. 6.

Chromatogram

---

[21] Id.



82.   The peak assignment table identified the flavor compounds by matching their m/z ratio with a computer database of virtually all known compounds. Exhibit B, GC-MS Report, January 31, 2020, p. 5.

<u>Peak Assignment Table</u>

**Table 1**

**Sheehan & Associates, P.C., Project #7608**
**Westsoy Organic Unsweetended Vanilla Soymilk**
**Production Code: 10219254714:44 1229629**
**Methylene Chloride Extract of with 1 ppm Matrix-Spiked Int. Std. by P&T-TD-GC-MS**

**Data File = TSQA3762**

| MS Scan # | Area Integration | Peak Assignment | Conc. PPM w/w |
|---|---|---|---|
| 132 | 1837527 | diacetyl | 1.18 |
| 186 | 110971 | acetol | 0.07 |
| 238 | 212546 | acetoin | 0.14 |
| 284 | 455852 | 1,2-propylene glycol (PG) | 0.29 |
| 339 | 17449 | hexanal | 0.01 |
| 381 | 27961 | methyl pyrazine | 0.02 |
| 428 | 20701 | hexyl alcohol | 0.01 |
| 490 | 98469 | gamma-butyrolactone | 0.06 |
| 553 | 355555 | hexanoic acid | 0.23 |
| 559 | 124675 | benzaldehyde | 0.08 |
| 576 | 25500 | 2-pentylfuran | 0.02 |
| 623 | 415090 | cyclotene | 0.27 |
| 639 | 362492 | N-methylpyrrolidinone (NMP) | 0.23 |
| 655 | 52342 | gamma-hexalactone | 0.03 |
| 661 | 123598 | heptanoic acid | 0.08 |
| 676 | 91395 | 2-acetylpyrrole | 0.06 |
| 693 | 93935 | guiaicol | 0.06 |
| 700 | 62741 | nonanal | 0.04 |
| 705 | 296423 | 3-hydroxy-4,5(R)-dimethyl-2(5H)-furanone | 0.19 |
| 743 | 45519020 | maltol | 29.23 |
| 761 | 482597 | octanoic acid | 0.31 |
| 769 | 138399 | benzoic acid | 0.09 |
| 800 | 209270 | decanal | 0.13 |
| 815 | 1557448 | naphthalene-d8 (internal standard) | 1.00 |
| 820 | 163504 | 2,3-dihydrobenzofuran | 0.10 |
| 853 | 872541 | nonanoic acid | 0.56 |
| 890 | 451734 | cinnamic aldehyde | 0.29 |
| 941 | 81667 | decanoic acid | 0.05 |
| 955 | 699778 | gamma-nonalactone | 0.45 |
| 1018 | 60098160 | vanillin | 38.59 |
| 1110 | 280100 | lauric acid | 0.18 |
| 1187 | 765501 | triethyl citrate | 0.49 |
| 1212 | 141266 | syringealdehyde | 0.09 |
| 1269 | 83629 | myristic acid | 0.05 |
| 1459 | 84413 | palmitic acid | 0.05 |
| | | **Total** | **73.75** |

83.     The relative amounts of the detected compounds are indicated in columns two (Area Integration) and four (concentration parts per million or "Conc. PPM w/w.").

84.     The most concentrated compounds, corresponding to the highest peaks were from vanillin (MS Scan # 1018, 38.59 PPM) and maltol (MS Scan # 743, 29.23 PPM).

85.     With respect to the four vanilla marker compounds, the Product  only contains vanillin.

86.     Because vanillin has the same chemical profile whether obtained from vanilla beans

18

or produced synthetically, the absence of p-hydroxybenzaldehyde, p-hydroxybenzoic acid and vanillic acid is significant.

87.   This is because most vanillin used in food to simulate vanilla is not obtained from vanilla beans but from artificial processes which convert natural source materials to vanillin.

88.   To evaluate whether the vanillin is from vanilla beans or ferulic acid, eugenol or lignin, the relative amounts of the four marker compounds are looked at to demonstrate authenticity of the vanilla.

89.   For instance, the ratio of vanillin to p-hydroxybenzaldehyde is roughly fifteen-to-one (15:1) in a sample of authentic vanilla derived from vanilla beans.

90.   Where a product or sample contains relative amounts of these compounds – or none at all – which deviate significantly from this ratio, it is a molecular indicator that what tastes like vanilla to plaintiff and consumers is actually not from vanilla.

91.   Given the total absence of the non-vanillin marker compounds and the high level of vanillin, the logical conclusion is that *if* real vanilla is used, it is in trace or *de minimis* amounts not detectable by advanced scientific means.

92.   Non-vanilla vanillin is typically added to flavors containing a drop of real vanilla to "fortify" or "spike" a vanilla taste.

93.   Though the amount of real vanilla may be non-detectable, it is likely present at some point far enough back in the supply chain so defendant can plausibly argue, "Yes, the Product contains vanilla."

94.   However, the Product's front label does not state "contains some vanilla" or "made with a drop of vanilla," but rather, designates the characterizing flavor as "Vanilla" without any qualifying terms.

95. The Product's front label fails to declare the presence of "other natural flavor" is based in part on the detection of maltol (MS Scan # 743, 29.23 PPM).

96. Maltol is a flavor enhancer and synthetic flavoring substance which does not "contribute a flavor of its own" but is used to enhance and substitute for real vanilla, by increasing the sweetness of a food or beverage.[22]

97. Given the importance of maltol to creating a vanilla flavor in the Product considering it appears to have little to no vanilla, and that maltol is designated a synthetic flavoring substance, no reasonable consumer would expect such an integral component of the Product to be synthetic as maltol is. *See* 21 C.F.R. § 172.515(b) ("Synthetic flavoring substances and adjuvants.").

VI.   The Product Should Be Labeled Artificially Flavored

98. To the extent the "Other Natural Flavors" contain vanillin from a natural source and made through a natural process, yet not derived from vanilla, it is misleading to not represent the Product as "Artificially Flavored" on the front label.

99. This is because the "standards of identity for vanilla extract (21 CFR 169.175) and vanilla flavoring (21 CFR 169.177) do not provide for the use of vanillin," such that even "natural vanillin" may not "be used to make natural vanilla flavors."   Exhibit B, FDA Letter, Ferre-Hockensmith to Richard Brownell, Jr., April 19, 2005, pp. 1-2; *see* 21 C.F.R. § 169.175(a)(1)-(5) (listing glycerin, propylene glycol, sugar, dextrose and corn sirup as only optional ingredients for vanilla extract).

100. Vanillin *may* be added to vanilla extract but the ingredient list must say "contains vanillin, an artificial flavor (or flavoring)." *See* Vanilla-vanillin extract at 21 C.F.R. § 169.180(b)

---

[22] 21 C.F.R. § 172.515(b) ("Synthetic flavoring substances and adjuvants."); Maltol, UL Prospector, Bryan W. Nash & Sons Ltd.1.   Linalool's concentration at 0.72 PPM exceeds more than half of the compounds detected by the GC-MS analysis, revealing its importance to the overall composition of the Product.

("The specified name of the food is 'Vanilla-vanillin extract _-fold' or '_-fold vanilla-vanillin extract', followed immediately by the statement 'contains vanillin, an artificial flavor (or flavoring)'.").

101.   Even if the vanillin is produced through a natural process, the front label statements and images imply the Product's flavor "is a 'natural vanilla flavor'" even though naturally produced vanillin "is not derived from vanilla beans.  Exhibit C, FDA Letter, Ferre-Hockensmith to Richard Brownell, Jr., August 5, 2008, p. 2.

102.   Naturally produced vanillin may be designated as "'natural flavor' or 'contains natural flavor'" in the context of the general flavor regulations at 21 C.F.R. § 101.22.  Exhibit C, FDA Letter, Ferre-Hockensmith to Richard Brownell, Jr., August 5, 2008, p. 2.

103.   However, adding any type or amount of vanillin to a vanilla extract or vanilla flavoring and implying the Product contains a "natural vanilla flavor" is misleading to consumers and in violation of law.

104.   If naturally produced vanillin were added separately to another finished food, it would be listed in the ingredients as "'vanillin' or 'natural flavor' but it should not be done in a way to imply that it is a 'natural vanilla flavor' because it is not derived from vanilla beans." Exhibit D, FDA Letter, Negash Belay to Agneta Weisz, October 10, 2008.

105.   Adding naturally produced vanillin to a real vanilla flavor like vanilla extract, coupled with statements and images of vanilla deceives consumers to think the vanilla taste is from vanilla beans.

106.   The FDA's guidance on labeling naturally derived vanillin allows for it to be labeled a "natural flavor" only outside the context of the standardized vanilla ingredients "under sections 169.180, 169.181, and 169.182 in 21 CFR."  Exhibit C, FDA Letter, Ferre-Hockensmith to Richard

Brownell, Jr., August 5, 2008, p. 2.

107.   A plain reading of the flavor regulations coupled with the complete absence of non-

vanillin marker compounds would require the Product be designated as "artificially flavored." *See*

21 C.F.R. § 101.22(i)(1)(ii) ("If none of the natural flavor used in the food is derived from the

product whose flavor is simulated, the food in which the flavor is used shall be labeled either with

the flavor of the product from which the flavor is derived or as 'artificially flavored.'").

VII. Products are Misleading Because They are Labeled and Named Similar to Other Products

   A.   Products of Competitor and Defendant

108.   The following is an example of the product of defendant and competitor.

Competitor Product                                        Product

    

**INGREDIENTS:** Organic Soymilk (filtered Water, Whole Organic Soybeans), Organic Cane Sugar, Tricalcium Citrate, Sea Salt, Organic Vanilla Flavor, Carrageenan, Vitamin A Palmitate, Vitamin D2, Riboflavin (B2), Vitamin B12

**INGREDIENTS:** ORGANIC SOYMILK (FILTERED WATER, WHOLE ORGANIC SOYBEANS), NATURAL VANILLA FLAVOR WITH OTHER NATURAL FLAVORS.

**INGREDIENTS:** Organic Soymilk (Filtered Water, Whole Organic Soybeans), Organic Cane Sugar, Tricalcium Citrate, Sea Salt, Organic Vanilla Flavor, Carrageenan, Vitamin A Palmitate, Vitamin D2, Riboflavin (B2), Vitamin B12.

**INGREDIENTS:** ORGANIC SOYMILK (FILTERED WATER, WHOLE ORGANIC SOYBEANS), NATURAL VANILLA FLAVOR WITH OTHER NATURAL FLAVORS.

109.   The competitor product lists "Organic Vanilla Flavor" on its ingredient list and does not indicate the presence of other flavors not derived from vanilla, as defendant's Products do through declaration of "With Other Natural Flavors."

B.   Misleading to Have Identical or Similar Product Names Where There Are Significant Differences in Product Quality or Composition

110.   Products are required to be identified and labeled in a way consistent with other products of similar composition.

111.   This framework assures consumers will not be misled by the quality and components of similarly labeled products where one product contains a greater amount, type and/or proportion of a characterizing and valuable ingredient.

112.   Where two products are identified by the same descriptive terms and noun such as "Vanilla Soymilk" and where the front label has no other modifications of these terms, consumers will be deceived into purchasing the lower quality product under the false impression that it contains the equivalent amount of said ingredients or components.[23]

---

[23] 21 C.F.R. § 102.5(a) ("General principles.") ("The name shall be uniform among all identical or similar products and may not be confusingly similar to the name of any other food that is not reasonably encompassed within the same name. Each class or subclass of food shall be given its own common or usual name that states, in clear terms, what it is in a way that distinguishes it from different foods.").

VIII.    Conclusion

113.    The identification of "Natural Vanilla Flavor With Other Natural Flavors" on the ingredient list is not sufficient to cure the misleading front label designation of "Vanilla" because it fails to tell consumers that the Product contains a de minimis amount of vanilla and that the vanilla taste is supplied by non-vanilla vanillin and maltol.

114.    Though plaintiff does not have the flavor sample used, the GC-MS analysis, the flavoring regulations and defendant's clear violation of the regulations provide support for the central contention that the Product's label deceives consumers to expect it contains more vanilla than it actually does.

115.    The Product's label violates the flavor declaration requirements because it either contains "an amount of characterizing ingredient insufficient to independently characterize the food, or the food contains no such ingredient."  *See* 21 C.F.R. § 101.22(i)(1)(i) (instructing that "the name of the characterizing flavor may be immediately preceded by the word 'natural' and shall be immediately followed by the word 'flavored'").

116.    Defendant's branding and packaging of the Product is designed to – and does – deceive, mislead, and defraud consumers.

117.    Defendant has sold more of the Products and at higher prices per unit than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

118.    The amount and proportion of the characterizing component, vanilla, has a material bearing on price or consumer acceptance of the Products because consumers are willing to pay more for such Products.

119.    The value of the Product that plaintiff purchased and consumed was materially less than its value as represented by defendant.

120.    Had plaintiff and class members known the truth, they would not have bought the

Products or would have paid less for it.

121.   The Product contains other representations which are misleading and deceptive.

122.   As a result of the false and misleading labeling, the Product is sold at a premium price, approximately no less than $3.89 per 5.3 OZ, excluding tax, compared to other similar products represented in a non-misleading way.

123.   As a result of the false and misleading labeling, the Product is sold at a premium price, approximately no less than $4.79 per 32 OZ, excluding tax, compared to other similar products represented in a non-misleading way.

<u>Jurisdiction and Venue</u>

124.   Jurisdiction is proper pursuant to 28 U.S.C. § 1332(d)(2) (Class Action Fairness Act of 2005 or "CAFA").

125.   Under CAFA, district courts have "original federal jurisdiction over class actions involving (1) an aggregate amount in controversy of at least $5,000,000; and (2) minimal diversity[.]" *Gold v. New York Life Ins. Co.*, 730 F.3d 137, 141 (2d Cir. 2013).

126.   Upon information and belief, the aggregate amount in controversy is more than $5,000,000.00, exclusive of interests and costs.

127.   This is a reasonable assumption because defendant's Products are sold in thousands of stores across the country and have been sold bearing the allegedly misleading claims for at least three years.

128.   Defendant is a citizen of New York because even though it is incorporated in Delaware, its principal place of business is in New York. *Andrews v. Citimortgage, Inc.*, No. 14-cv-1534 (JS)(AKT) (E.D.N.Y. Mar. 31, 2015) ("[a] corporation has dual citizenship for purposes of a federal court's diversity jurisdiction under 28 U.S.C. § 1332; namely, it is a citizen of the state

of its incorporation and of the state where it has its principal place of business.").

129.   "Minimal diversity" exists because even though the parties are both citizens of this state, plaintiff seeks to represent persons in all 50 states who purchased the Products. *Gonzales v. Agway Energy Services, LLC*, No. 18-cv-235 (N.D.N.Y. Oct. 22, 2018) ("At this time, the allegation that some class member maintains diversity with Defendant is sufficient to establish minimal diversity under CAFA" and citing 28 U.S.C. § 1332(d)(1)(D) "'the term 'class members' means the persons (named or unnamed) who fall within the definition of the proposed or certified class in a class action.").

130.

131.   Defendant is a Delaware corporation with a principal place of business in New Hyde Park, Nassau County, New York and is a citizen of New York.

132.   This court has personal jurisdiction over defendant because it conducts and transacts business, contracts to provide and/or supply and provides and/or supplies services and/or goods within New York.

133.   Venue is proper because plaintiff and many class members reside in this District and defendant does business in this District and State.

134.   A substantial part of events and omissions giving rise to the claims occurred in this District.

<div align="center">Parties</div>

135.   Plaintiff is a citizen of New York, New York County, New York.

136.   Defendant Westbrae Natural, Inc. is a Delaware corporation with a principal place of business in New Hyde Park, New York, Nassau County.

137.   During the relevant statutes of limitations, plaintiff purchased, used or consumed the Product within this district and/or State for personal consumption in reliance on the

representations.

## Class Allegations

138.   The classes will consist of all purchasers of the Products in New York, the other 49 states and a nationwide class, during the applicable statutes of limitations.

139.   Common questions of law or fact predominate and include whether defendant's representations were and are misleading and if plaintiff and class members are entitled to damages.

140.   Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive representations and actions.

141.   Plaintiff is an adequate representative because her interests do not conflict with other members.

142.   No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

143.   Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

144.   Plaintiff's counsel is competent and experienced in complex class action litigation and intends to adequately and fairly protect class members' interests.

145.   Plaintiff seeks class-wide injunctive relief because the practices continue.

## New York GBL §§ 349 & 350
### (Consumer Protection from Deceptive Acts)

146.   Plaintiff incorporates by reference all preceding paragraphs.

147.   Plaintiff and class members desired to purchase, consume and use products or services which were as described and marketed by defendant and expected by reasonable consumers, given the product or service type.

148.   Defendant's acts and omissions are not unique to the parties and have a broader

impact on the public.

149.   Defendant misrepresented the substantive, quality, compositional, organoleptic and/or nutritional attributes of the Products.

150.   Defendant's conduct was misleading, deceptive, unlawful, fraudulent, and unfair because it gives the impression to consumers the Products contain sufficient amounts of the highlighted ingredient, vanilla, to independently characterize the taste or flavor of the Products, did not contain other flavor components which simulate, resemble or reinforce the characterizing flavor and only contained flavor from vanilla.

151.   Plaintiff  and class members would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

<u>Negligent Misrepresentation</u>

152.   Plaintiff incorporates by reference all preceding paragraphs.

153.   Defendant misrepresented the substantive, quality, compositional, organoleptic and/or nutritional attributes of the Products.

154.   Defendant's conduct was misleading, deceptive, unlawful, fraudulent, and unfair because it gives the impression to consumers the Products contain sufficient amounts of the highlighted ingredient, vanilla, to independently characterize the taste or flavor of the Products, did not contain other flavor components which simulate, resemble or reinforce the characterizing flavor and only contained flavor from vanilla.

155.   Defendant had a duty to disclose and/or provide non-deceptive marketing of the Products and knew or should have known same were false or misleading.

156.   This duty is based on defendant's position as an entity which has held itself out as having special knowledge and experience in the production, service and/or sale of the product or

service type.

157.  The representations took advantage of consumers' (1) cognitive shortcuts made at the point-of-sale and (2) trust placed in defendant, a well-known and respected brand in this sector.

158.  Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, the purchase of the Products.

159.  Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Breaches of Express Warranty, Implied Warranty of Merchantability and
Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*</u>

160.  Plaintiff incorporates by reference all preceding paragraphs.

161.  The Products were manufactured, labeled and sold by defendant and warranted to plaintiff and class members that they possessed substantive, functional, nutritional, qualitative, compositional, organoleptic, sensory, physical and other attributes which they did not.

162.  Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Products.

163.  This duty is based, in part, on defendant's position as one of the most recognized companies in the nation in this sector.

164.  Plaintiff provided or will provide notice to defendant, its agents, representatives, retailers and their employees.

165.  Defendant received notice and should have been aware of these misrepresentations due to numerous complaints by consumers to its main office over the past several years.

166.  The Products did not conform to their affirmations of fact and promises due to defendant's actions and were not merchantable.

167. Plaintiff and class members would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

<u>Fraud</u>

168. Plaintiff incorporates by references all preceding paragraphs.

169. Defendant's conduct was misleading, deceptive, unlawful, fraudulent, and unfair because it gives the impression to consumers the Products contain sufficient amounts of the highlighted ingredient, vanilla, to independently characterize the taste or flavor of the Products, did not contain other flavor components which simulate, resemble or reinforce the characterizing flavor and only contained flavor from vanilla.

170. Defendant's fraudulent intent is evinced by its failure to accurately identify the Products on the front label when it knew this was not true.

171. Plaintiff and class members would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

<u>Unjust Enrichment</u>

172. Plaintiff incorporates by reference all preceding paragraphs.

173. Defendant obtained benefits and monies because the Products were not as represented and expected, to the detriment and impoverishment of plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and undersigned as counsel for the class;

1of 32

2. Entering preliminary and permanent injunctive relief by directing defendant to correct the challenged practices to comply with the law;

3. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, restitution and disgorgement for members of the State Subclasses pursuant to the applicable laws of their States;

4. Awarding monetary damages and interest, including treble and punitive damages, pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated:   March 2, 2020

<div style="margin-left:50%">

Respectfully submitted,

Sheehan & Associates, P.C.
/s/Spencer Sheehan
_____
Spencer Sheehan
505 Northern Blvd Ste 311
Great Neck NY 11021-5101
Tel: (516) 303-0552
Fax: (516) 234-7800
*spencer@spencersheehan.com*
E.D.N.Y. # SS-8533
S.D.N.Y. # SS-2056


Reese LLP
Michael R. Reese
100 W 93rd St Fl 16
New York NY 10025-7524
Telephone: (212) 643-0500
Fax: (212) 253-4272
*mreese@reesellp.com*

</div>

1:19-cv-09677-PKC
United States District Court
Southern District of New York

Natasha Barreto, individually and on behalf of all others similarly situated,

                         Plaintiff,

       - against -

Westbrae Natural, Inc.,

                         Defendant

## First Amended Class Action Complaint

```
Sheehan & Associates, P.C.
  505 Northern Blvd Ste 311
  Great Neck NY 11021-5101
      Tel: (516) 303-0552
      Fax: (516) 234-7800
```

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information, and belief, formed after an inquiry reasonable under the circumstances, the contentions contained in the annexed documents are not frivolous.

Dated:  March 2, 2020

                                          /s/ Spencer Sheehan
                                          Spencer Sheehan